FILED

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| **CLAUDE B. HESTER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CV-99-PT-1123-E** |
| | ) | |
| **TYSON FOODS, INC., et. al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

ENTERED
DEC 1 1 2000

## MEMORANDUM OPINION

This cause comes to be heard upon defendant Tyson Food's ("defendant") Motion for Summary Judgment, filed August 28, 2000. Plaintiff Claude Hester ("plaintiff") brought this action against the defendant for race discrimination and retaliation under Title VII and 42 U.S.C. § 1981.

## FACTS

The defendant hired the plaintiff to work in its Ashland, Alabama plant around August 8, 1998. After spending a few weeks as a "rehanger," the plaintiff transferred to the position of "U.S.D.A. Trimmer," ("trimmer") also known as "Inspector's helper." As a trimmer, the plaintiff assisted U.S.D.A. Inspectors by pulling birds off of a conveyor belt, removing parts of the birds that the inspectors instructed him to remove, and then rehanging the birds on the conveyor belt. The job involved both lifting and turning around. The plaintiff's supervisors were Hershel Barker, the Evisceration Department's Night Superintendent, and Bruce Pugh, the Evisceration Supervisor.

1



In October, 1998, the plaintiff began to suffer back problems. His treating physician wrote a letter to the defendant, requesting that the defendant allow the plaintiff to use a stool while he was working. The letter does not describe the use of a stool as "a medical necessity." Instead, it states that providing the plaintiff with a stool would be "common courtesy." The plaintiff's supervisors discussed providing a stool for the plaintiff with other members of the plant's management. They were informed that using a stool in that particular job description was prohibited because it would create a safety hazard. Barker and Pugh related the information to the plaintiff and told him that if he wished to change job positions to one in which stools were permissible, he could do so. The plaintiff indicated that he did not want to change job descriptions. The plaintiff testified in his deposition that the U.S.D.A. inspectors that he worked with told him that they did not mind the presence of a stool. The plaintiff also testified that the "head plant manager" told him that he did not mind the plaintiff's using a stool because trimmers had used stools in the past. At the time that the plaintiff was a trimmer, none of the trimmers were allowed to use stools. The plaintiff testified that none of the trimmers that he was aware of used stools.

On December 14, 1998, the plaintiff observed a "non-black co-employee" using a stool to perform his job. This employee, a Hispanic man named Francisco Diaz, performed a different job than the plaintiff. Diaz was a "drawhand," an employee who removed the entrails from the birds. Because the drawhand position is a stationary position, the employees are allowed to use stools. When the plaintiff saw that Diaz had a stool and heard that Pugh had provided the stool for Diaz, he became angry and accused Pugh of racial discrimination. Later, the plaintiff filed with Tyson human resources a grievance for race discrimination against Pugh.

On December 21, 1998, the plaintiff experienced severe back pain. With permission

2

from his supervisor, he went first to the in-house nurse and then immediately to the emergency

room of a nearby hospital.  When the plaintiff left to go to the emergency room, the nurse

notified his supervisor.  At the emergency room, the plaintiff was examined, given pain

medication, and detained for a time in order to ensure that he was able to drive back to the plant.

The plaintiff then drove himself back to work.  The emergency room physicians indicated that

the plaintiff did not need to be restricted from returning to work.

Upon arriving at the plant, the plaintiff met Barker in the hall outside the breakroom.

Barker instructed the plaintiff to not return to work that day, but instead to "clock out" and wait

in the breakroom until the plaintiff's wife finished her shift.[1]  Barker then told Pugh that the

plaintiff would not be working for the rest of the shift.  The plaintiff did not "clock out,"

however, until the end of the shift, at the same time that his wife clocked out.

The following day, the clock report that indicated that the plaintiff had not clocked out

until the end of the shift was brought to Pugh.  Pugh advised the human resources department of

the plaintiff's actions, which he suspected to be "time card fraud."  The defendant considered

time card fraud to be tantamount to theft.  At that time, human resources notified Pugh that the

plaintiff had filed a race discrimination grievance against him.  Later, the human resources

department instructed Pugh to ask the plaintiff for his side of the story and granted Pugh the

discretion to terminate his employment if Pugh thought that he had actually committed the time

card fraud.  Pugh questioned the plaintiff in front of the union steward.  After talking with the

plaintiff, Pugh, convinced that the plaintiff had committed time card fraud, discharged him.

After the plaintiff was discharged, the defendant transferred into the Evisceration Department the

---

[1] The plaintiff's wife also worked at the plant; she and the plaintiff rode to and from work together and worked the same shift.

3

plaintiff's wife, also an African American, to be the plaintiff's replacement.

The plaintiff filed a charge of discrimination with the EEOC. In the charge, the plaintiff alleged that the causes of the discrimination were his race and disability. The plaintiff did not claim retaliation in the EEOC charge, or even hint that he thought that his discharge was a retaliatory action. Instead, the plaintiff claimed:

> "I believed I was discriminated against in violation of Title VII of the 1964 Civil Rights Act . . . and the Americans with Disabilities Act. I contend that no other employee was discharged for the same or similar reason as me. I also requested a stool to sit on as an accommodation for a condition my physician state (sic) does not substantially limit a major life activity."

The plaintiff subsequently filed suit pro se on May 13, 1999. After he retained counsel, he filed an amended complaint on November 4, 1999, in which he alleged claims of discrimination under the ADA and Title VII. Later, the plaintiff amended the complaint for a second time, voluntarily dismissed his ADA claim, and added the 42 U.S.C. § 1981 claim for race discrimination and a claim for retaliation. Currently the plaintiff claims race discrimination and retaliation.

## SUMMARY JUDGMENT STANDARD

A motion for summary judgment is to be granted if there is no genuine issue of material fact. United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437 (11th Cir. 1991). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. The evidence of the non-moving party is to be believed, and the court is not to attempt to perform jury functions such as credibility determinations. Id. After considering everything in the record, all permissible inferences are to be drawn in favor of the non-moving party. Clinkscales v. Chevron USA, Inc., 831 F.2d 1565, 1570 (11th Cir. 1987).

When the non-moving party has the burden of proof at trial, he must come forward with

4

sufficient evidence on each element that must be proved. Earley v. Champion International

Corp., 907 F.2d 1077, 1080 (11th Cir. 1990). If the evidence is merely colorable or is not

significantly probative, summary judgment may be proper. Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 250, 106 S. Ct. 2505, 2511 (1986). Summary judgment is appropriate if on any

element there would be insufficient evidence to require submission of the case to a jury. Earley,

907 F.2d at 1080. "The plain language of Rule 56(c) mandates the entry of summary judgment

against a party who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial. In

such circumstances, there can be 'no genuine issue of material fact,' since a complete failure of

proof concerning an essential element of the non-moving party's case necessarily renders all

other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 327 S. Ct. 2548, 2555 (1986).

## ARGUMENT

In its motion for summary judgment, the defendant first argues that the plaintiff has not

introduced enough evidence to survive summary judgment on his disparate treatment claim

under Title VII or § 1981. The essential elements, burdens of proof, and analyses for Title VII

and section 1981 disparate treatment discrimination cases are identical. Ferrill v. The Parker

Group, Inc., 168 F.3d 468, 472 (11th Cir. 1999)("The test for intentional discrimination in suits

under § 1981 is the same as the formulation used in Title VII discriminatory treatment cases.");

Standard v. A.B.E.L. Servs., Inc., 161 F. 3d 1318, 1330 (11th Cir. 1998)("therefore we shall

explicitly address the Title VII claim with the understanding that the analysis applies to the §

1981 claim as well."). Therefore, the court will analyze the plaintiff's race discrimination claims

under §1981 and Title VII simultaneously.

The plaintiff alleges disparate treatment both in the defendant's refusal to provide him

5

with a stool and in the defendant's termination of his employment.  The defendant argues that

the plaintiff cannot make out a prima facie case of race discrimination for either incident.  The

McDonnell-Douglas prima facie test for disparate treatment is:

> (1) The plaintiff is a member of a racial minority;
> (2) He was subjected to adverse employment action;
> (3) His employer treated similarly situated members outside his protected class more
> favorably; and
> (4) He was qualified to do the job.

Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997)(per curiam); Coutu v. Martin City Bd.

of County Comm'rs., 47 F.3d 1068, 1073 (11th Cir. 1995).  In the case of allegedly

discriminatory discharge, the plaintiff must demonstrate that "the misconduct for which the

employer discharged him was the same or similar to what a similarly situated employee engaged

in, but that the employer did not discipline the other employee similarly."  Lathem v.

Department of Children & Youth Servs., 172 F.3d 786, 792 (11th Cir. 1999).  In any case of

disparate treatment, the plaintiff must show that he and the other employee are "similarly

situated in all relevant respects."  Holifield, 115 F.3d at 1562.  It is necessary for the court to

consider "whether the employees are involved in or accused of the same or similar conduct and

are disciplined in different ways."  Id.  In the absence of other evidence of discrimination,

summary judgment should be granted if the plaintiff cannot show the existence of a similarly

situated employee.  Id.

**Disparate treatment– the stool incident**

Specifically, the defendant argues that in neither instance can the plaintiff demonstrate

that similarly situated employees were treated differently.  With regard to the plaintiff's claims

about the stool, the defendant argues that the plaintiff cannot prove that Diaz was similarly

situated to the plaintiff because Diaz's job description required him to remain in one place while

6

the plaintiff's job description required mobility. The defendant offers this evidence to show that because of the differences in activity, giving Diaz a stool would not create the safety hazard that would be created by giving the plaintiff a stool. Additionally, the defendant points to the plaintiff's deposition testimony in which the plaintiff stated that he was unaware of any of the five trimmers being allowed to use a stool on the job. The defendant also argues that the plaintiff cannot show that the other employee is outside of the plaintiff's protected class because Diaz is Hispanic.[2] Finally, the defendant summarizes its arguments by asserting that the plaintiff has put forth absolutely no evidence to show that he was not given the stool because of his race. The plaintiff does not respond to any of these arguments.

**Retaliatory discharge**

With regard to the discharge, the defendant first argues that the plaintiff's retaliation claim should be dismissed. In order to establish a prima facie case of retaliation, the plaintiff must show:

(1) that he engaged in statutorily protected expression;
(2) that he suffered an adverse employment action; and
(3) that there is some causal relationship between the two events.

Holifield v. Reno, 115 F.3d 1555, 1566 (11th Cir. 1997).

The defendant first argues that the plaintiff's retaliation claim should be dismissed because the plaintiff did not allege retaliation in his EEOC charge. On the face of the charge itself, the space for "retaliation" is blank, while the spaces for "race," "disability," and "other" are checked. In the body of the written explanation of the charge, the plaintiff does not refer to retaliation. Instead, it alleges straight disparate treatment and discriminatory discharge. The

---

[2] The court rejects this argument as such.

7

defendant notes that "[a] judicial complaint is limited to the scope of the administrative investigation which could be reasonably expected to grow out of the charge of discrimination." Griffin v. Carlin, 755 F.2d 1516, 1522 (11th Cir. 1985). The defendant asserts that because separate allegations of retaliation are contemplated within the format of the charge, the plaintiff's failure to mention retaliation in his EEOC charge meant that the EEOC would not have known to investigate the claim. The defendant argues that because the EEOC did not investigate the retaliation claim, the plaintiff has not exhausted his administrative remedies on the retaliation claim. The defendant asks that the court limit the actionable claims in the plaintiff's complaint to those allegations stated in the EEOC charge. The plaintiff does not respond to this argument.

In the alternative, the defendant argues, the court should still grant it summary judgment on the plaintiff's retaliation claim because the plaintiff cannot show that he engaged in protected activity. The defendant cites Little v. United Technologies, 103 F.3d 956, 960 (11th Cir. 1997) for the proposition that the assertion of rights for which the plaintiff claims that he suffered retaliation must meet a minimum level of credibility in order to be protected. In Little, the Eleventh Circuit held that in order for a plaintiff to establish a prima facie case of retaliation for opposition to an unlawful employment practice, he had to show not only "that he had a good faith belief that his employer was engaged in an unlawful employment practice, but also that his belief was objectively reasonable in light of the facts and record presented." Id. Looking at the record before it, the court decided that no rational jury could find that the plaintiff reasonably could believe that his outspoken and repeated opposition to a single racially derogatory comment constituted opposition to an unlawful employment practice. Id. The defendant likens the plaintiff's case to Little, arguing that no rational jury could find that the plaintiff's belief that his

opposition to not being given a stool to use while another employee with a different job description was given one constituted opposition to an unlawful employment practice.

The plaintiff argues that "voicing one's concerns about racial discrimination to one's superiors . . . is a protected activity," quoting Carr v. Stillwaters Development Co., 83 F. Supp. 2d 1269, 1277-1278 (M.D. Ala. 1999), which in turn is based on Holifield, in which the Eleventh Circuit found that Holifield's complaints and EEO charges were statutorily protected. 115 F.3d at 1566. The plaintiff concludes that since he complained of the alleged discrimination verbally and in a written grievance to his supervisors and to the human resources department, his activity was automatically protected. The Holifield court indeed found that Holifield's complaining about what he perceived to be racial discrimination was a protected activity. Neither the Little court nor the defendant has asserted that complaining about racial discrimination is not a protected activity. Rather, Little stands for the proposition that opposing a perceived unlawful employment practice by complaining about it to one's superiors is not a protected activity *per se*. 103 F.3d at 960 ("the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable."). According to Little, the plaintiff still must demonstrate the reasonableness of his belief that the actions giving rise to his complaints constituted an unlawful employment practice. Id. The defendant argues that the plaintiff has not done so.

The plaintiff argues that he not only has established that he engaged in protected activity, but also has established the adverse employment action, the termination of his employment, as well as the necessary causal connection. According to the plaintiff, the fact that Pugh, the supervisor who discharged the plaintiff, had heard that the plaintiff had filed a racial discrimination grievance against him the day before he terminated the plaintiff is a sufficient

causal connection.[3]  The defendant, apparently secure in its arguments that the retaliation claim

is meritless because the plaintiff did not allege retaliation in its EEOC charge and did not engage

in protected activity, does not argue that the plaintiff's prima facie retaliation case is deficient in

any other area.

## Discriminatory discharge

In his EEOC complaint, the plaintiff claimed that his discharge was discriminatory

because "no other employee was discharged for the same or similar reason as me."  The

defendant, however, points to evidence showing that at least three of its employees have been

terminated for "time card fraud." Pugh, depo., p. 45.  The defendant also contends that the

plaintiff cannot prove its prima facie case of racially discriminatory discharge because it

replaced the plaintiff with another African American employee, the plaintiff's wife.

The plaintiff maintains that he can show that other similarly situated employees were

treated differently.  The plaintiff, without providing specific citations, claims that the defendant

conceded that the company's written policies did not address "time card fraud" but instead

prohibited "theft" or "stealing."  The plaintiff also points out that the punishment for a lesser

offense, "failure to clock in/out" mandates only a written or verbal warning.[4]  The plaintiff

argues that since the defendant *could have* given the plaintiff a lesser punishment by

characterizing his actions as simple "failure to clock in/out" instead of "time card fraud/theft,"

the fact that it *did not* do so indicates that it was treating similarly situated employees differently.

The plaintiff has testified on deposition that he was so heavily medicated that he was incapable

---

[3]  The court notes that he found it out when he was reporting the incident which purportedly provided the basis for the termination.

[4]  Apparently, however, the plaintiff *did* clock out.  He did so late.

10

of working and unable to remember to clock out.[5]  The plaintiff questions the reasonableness of
asserting that a worker who knew that his supervisors knew that he was not working and knew
that a clocking report would be issued would intentionally leave himself on the clock in order to
receive payment for that time.

After the submission date, the court ordered the parties to submit additional evidence,
particularly as to discipline meted out to employees charged with time card fraud.  The evidence
provided to the court reflects that both African Americans and Hispanics have been terminated
for time card fraud.  There is no evidence that whites have been treated differently.

### CONCLUSION OF COURT

The court concludes that the plaintiff's claim of discriminatory treatment is due to be
dismissed because there is no evidence that persons similarly situated to plaintiff were allowed
to use stools.  He was replaced by a person of the same race.

With regard to the ~~discrimination~~ retaliation claim, the court assumes that such a claim can be
brought pursuant to § 1981.  The retaliation claim is, however, initially borderline because it is
questionable that the plaintiff "had a good faith belief that his employer was engaged in an
unlawful employment practice. . . [and] that his belief was objectively reasonable in light of the
facts. . ."  The court will assume, however, that the plaintiff has crossed this threshold.  The
court cannot, however, conclude that the plaintiff has created a reasonable inference that there
was a causal relationship between his protected expression and the termination.

The court recognizes that the termination followed immediately after the plaintiff's

---

[5] This particular argument would be more plausible had the hospital *not* specifically detained the plaintiff
in order to observe the effects of the medication and subsequently declared him to be fit to drive.  It also does not
explain how the plaintiff was sufficiently sober to remember to clock out at the end of the shift when he was not
sufficiently able to clock out after he was instructed to do so by his supervisor.

11

complaint about Pugh.  There is, however, a perfectly reasonable explanation for this.  <u>Prior</u> to

the time that Pugh had learned of the complaint, he had gone to the human resources department

to report the alleged time card fraud which normally resulted in termination.  The plaintiff's

complaint did not shield him from the discipline which was already a part of the company

policy.  There is no substantial evidence that the plaintiff's termination was caused by his

complaint.  The defendant's motion will be Granted.

This 11th day of December 2000

**ROBERT B. PROPST**

**SENIOR UNITED STATES DISTRICT JUDGE**